**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

HELEN L. ALMANZA,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-3069-MWB

**REPORT AND RECOMMENDATION**

_____

*TABLE OF CONTENTS*

*I.*     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    *A.*   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*   *Introductory facts and Almanza's hearing testimony* . . . . . . **3**
        *2.*   *Almanza's medical history* . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*   *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . **19**
        *4.*   *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

*III.*   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . **23**

    *A.*   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **23**
    *B.*   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **26**

*IV.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

*V.*    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

# I.  INTRODUCTION

The plaintiff Helen L. Almanza ("Almanza") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits.  Almanza claims the ALJ erred in failing to give appropriate weight to the opinion of a nurse practitioner, and in failing to consider the effects of Almanza's obesity on her other impairments.  (*See* Doc. No. 12)

# II.  PROCEDURAL AND FACTUAL BACKGROUND

## A.  Procedural Background

On June 12, 2002, Almanza filed an application for DI benefits, alleging a disability onset date of November 3, 2001.  (*See* R. 49-51)  Almanza claimed she was disabled due to"deep depression, dislocated hips, also foot injury[,] diabetes, [and] over weight." (R. 90)  Almanza's application was denied initially and on reconsideration, and Almanza requested a hearing.  While her request for hearing was pending, Almanza filed an application for SSI benefits, on January 27, 2004, citing the same disability onset date. (*See* R. 235-38)  Her application for SSI benefits was accelerated for consideration along with her pending DI application.  (*See* R. 13)

A hearing was held in Fort Dodge, Iowa, on February 8, 2005, before ALJ George Gaffaney.  (R. 239-74)  Almanza was represented at the hearing by attorney Nancy Withers.  Almanza testified at the hearing, and Vocational Expert ("VE") George Brian Paprocki also testified.  On May 20, 2005, the ALJ ruled Almanza was not disabled. (R. 10-25)  Almanza appealed the ALJ's ruling, and on September 2, 2005, the Appeals Council denied Almanza's request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Almanza filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Almanza's claim. Almanza filed a brief supporting her claim on April 25, 2006. (Doc. No. 12) The Commissioner filed a responsive brief on June 2, 2006. (Doc. No. 13) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Almanza's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Almanza's hearing testimony

At the time of the hearing, Almanza was fifty-one years old. She is a high school graduate and has taken about sixty hours of college credit in the area of computer programming. She did not complete the course work because she was in a car accident right before she completed the course. (R. 243)

Since her alleged disability onset date of November 3, 2001, Almanza has done occasional babysitting for a friend, but she has never earned as much as $200 a month doing babysitting. She volunteers at her church for thirty minutes to an hour on Fridays, to help put together the church bulletins. She worked part-time as an office helper during college, as part of a work-study program. (R. 263) The record reflects Almanza had the following earnings: 2001 - $5929.07; 2000 - $11,801.74; 1999 - $15,829.98; 1998 - $14,542.94; 1997 - $2592.51; 1996 - $3363.92; 1995 - $.00; 1994 - $853.19; 1993 - $.00; 1992 - $.00; 1991 - $5034.89; 1990 - $7999.88; 1989 - $12,016.91; 1988 - $6539.74. (R. 71-72)

Almanza's last employment was as a clerk and cashier at Affiliated Foods of Manson, where she worked from April 23 to November 3, 2001. (R. 78; R. 244)

According to Almanza, she was fired from the job in November 2001, after she was injured in an accident when a buffer machine ran over her right foot. (R. 78; R. 244-45) Almanza stated she suffered an injury to her ligaments and tendons. The injury was not diagnosed properly until she saw Brian L. Hamm, D.P.M., in February 2003. (R. 244; see R. 196) Almanza has not returned to see Dr. Hamm since he made the diagnosis, due to lack of funds. (R. 244-45)

Almanza stated she did not pursue a worker's compensation claim because she was suffering from depression and she was suicidal. According to Almanza, her boss told her she was unworthy, irresponsible, and unreliable, which reinforced her feelings of depression. (R. 245)

Almanza lives alone and has no source of income other than her sporadic babysitting. Her rent and utilities are paid by the Mid-Iowa Regional Housing Association, and she receives $149 in food stamps each month. She gets paper products and toiletries from her church pantry. (R. 245-46) She had planned to try a part-time janitorial job at her church until she learned the job involved heavy lifting, which she felt she could not do. She has looked for other part-time work periodically, on her good days. She indicated she sometimes has concentration and memory problems, with some days being better than others. (R. 259)

Almanza stated she has problems with her injured foot swelling when she is active or, sometimes, when the weather changes. She can alleviate her discomfort somewhat by elevating her foot. Her obesity also aggravates her foot problems. (R. 246) Almanza indicated she also has "dislocated" hips. She will "baby" whichever hip is hurting at any given time, causing excess pressure on the other leg, which then causes her problems with her knees. She explained that she was involved in an automobile accident in the early 1980s, injuring her hips and back, which she stated creak "like an old farm screen door."

(R. 247) She stated her hips pop in and out of place, which she refers to as dislocation. (R. 250) When one of her hips pops out, she will stumble like "a drunk would do." (*Id.*)

Almanza indicated her pain level varies. She has a high pain tolerance, but nevertheless, on some days, it hurts her to do anything at all. She has tried prescription pain medications but she suffered undesirable side effects. For example, she stated one of the pain medications elevated her blood pressure, while another one made her spacey. (R. 248) The side effects made her leery of trying further prescription medications, so she only takes Ibuprofen, Tylenol, or aspirin. (*Id.*) She also uses a heating pad on her back and hips. She stated she cannot afford to see a doctor about her hip and back pain. (R. 249)

Almanza estimated that on a good day, she can walk up to two or three blocks before she has to sit down and rest. Depending on how she is feeling, the shape of the chair, and the room temperature, she can sit in an office-type chair for fifteen to thirty minutes at a time before she has to change position. On a good day, she can stand for ten to fifteen minutes at a time, but on a bad day, she can only stand for five minutes at a time before she must sit down and rest. She stated when she is standing, she "can feel the pressure starting to build," and then she knows it is time to sit down. (R. 254) She is able to bend down and kneel, depending on how her hips are feeling, but she can never crawl. (R. 255) She has problems falling asleep, but sleeps well once she finally falls asleep. (R. 255-56)

Almanza walks to the grocery store, which is between two and three blocks from her home. She takes her grandson's stroller with her, puts her groceries in the stroller, and pushes it home. (R. 255) She takes care of her own cooking and house cleaning. She can stand to do dishes for five to fifteen minutes at a time, depending on how she is feeling, and then she has to take a break and sit down. On a good day, Almanza can do

her dishes, make her bed, take a shower, and walk a couple of blocks to the library to check her e-mail. (R. 250-51)

With regard to her depression, Almanza stated she has good days and bad days. Sometimes she does not leave her house because of depression and feelings of unworthiness. (R. 249) Since she has been in therapy for her depression, Almanza estimated she has three or four good days each week. (R. 250-52) On a bad day, she will feel suicidal. She has feelings that she is unworthy, and is just "taking up space that somebody else could use, breathing air that somebody else could use." (R. 252) She plans numerous ways she could kill herself, including over-dosing on her diabetic medications or on sugar, or cutting her jugular in the shower. (R. 252) She may have a good day one day, and a bad day the next. She indicated she has missed family outings and functions with her children due to her depression and anxiety. (R. 272)[1] She stated she does not test her blood sugar regularly because she cannot afford to buy the test strips, but she knows the symptoms when her blood sugar level gets to high or too low. She stated that in any event, it was "not a big deal. Whether I'm alive or dead don't matter." (R. 273)

Almanza has two grown daughters. One is in the Air Force and lives in Bellevue, Nebraska. The other is a Registered Nurse and lives in the Quad Cities area. Her daughter from Bellevue comes and picks her up every three or four months, and takes her back to Bellevue for a visit that may last from one to three weeks. (R. 252-53)

Almanza stated the things that prevent her from working are low self-esteem and pain. She stated that during the hearing, she was having pain in her right hip, leg, foot, and in between her shoulders. (R. 256) She asked for a foot stool or something on which to rest her feet at the start of the hearing. (R. 241-42) She indicated she could not return to her past work as a cashier because of the standing and lifting involved. She stated she

---

[1] The record indicates Almanza was tearful during the hearing when she discussed her depression. (*See* R. 272)

enjoyed the customer service work she did once she was able to get to work, but her low self-esteem and anxiety made it very difficult for her to get herself to work. (R. 256-57) She still has anxiety attacks anywhere from once or twice a week to once or twice a month. She has not been able to identify a trigger for the attacks, which occur both at home and when she is out. (R. 260-61) In addition, she sometimes has problems with concentration and memory. (R. 259)

Almanza stated her mental health problems affect her ability to get along well with people because she feels unworthy and feels others are better and more deserving than she is. She indicated that when she was working, she did not have problems getting along with coworkers because she would let people abuse her and take things out on her. According to Almanza, she was blamed for things her brothers did growing up, and she tends to internalize events from others' lives. She gave two examples. Once, when she was a teenager, a little boy got bitten by a rabid dog. Almanza stated she cried herself to sleep thinking it should have been her who got bitten because she was unworthy and the little boy did not deserve to be bitten. In the second example, Almanza stated she was in the hospital in November 2003, for complications of her diabetes. When she was nearing release, she happened to notice that another patient had flowers in her room. Almanza stated she became very depressed because it seemed no one cared that she was in the hospital. She decided that when she got home, she was going to commit suicide. According to Almanza, one of the nurses recognized that she had become suicidal, and Almanza was transferred to the mental ward for a time. (R. 257-59)

Almanza indicated a ministry assistant at her church had seen her a couple of times when Almanza was feeling suicidal. Almanza stated "they actually thought that they was going to have to run me into Fort Dodge to Mental Health." (R. 272-73)

## 2.    *Almanza's medical history*

At the time of the hearing, Almanza was taking the following medications: Paxil for depression and Buspar for anxiety, both of which were prescribed by Joan Kitten, a psychiatric nurse practitioner at North Central Iowa Mental Health Center; Glucotrol and Glucophage for diabetes, prescribed through the free clinic in Manson, Iowa; and Teveten for high blood pressure, also prescribed through the free clinic. She was supposed to take Lipitor, as well, but indicated she could not afford to buy the medication. (R. 130)

Almanza was seen at the Manson Clinic on June 29, 2001, for evaluation of her diabetes and refill of her medications. She reportedly smoked one pack of cigarettes per day and drank socially. She stated she had lost fifty-seven pounds during the previous year, and at the time of this exam, she weighed 259 pounds. She was on Glucotrol for diabetes, Ibuprofen and Celebrex for pain, and Buspar for anxiety. Her blood pressure was slightly elevated. Her prescriptions were refilled and lab tests were ordered. (R. 162)

Almanza returned to the clinic on September 17, 2001, for follow-up and refills of her medications. She complained of right heel pain, especially when her back was hurting, and pain in her wrist. She stated Celebrex helped her pain somewhat, and she had noticed her pain increasing after she ran out of the medication. Ted George, D.O. diagnosed Almanza with Type II diabetes, osteoarthritis, plantar fasciitis of the right foot, and upper extremity and cervical dysfunction. He directed Almanza to wear hard-soled shoes and use good insoles in her shoes. He noted if her heel pain continued, a Cortisone injection might be warranted. He refilled her other medications. (R. 161)

On October 1, 2001, Almanza saw Dr. George complaining that a grocery cart had hit her left ankle at work on September 5, 2001, and she had experienced ankle and foot pain ever since. She had tried an ankle splint without relief. On examination of Almanza's ankle, the doctor noted no swelling or gross deformity, although Almanza exhibited discomfort on her ankle and heel. An x-ray of her right ankle showed no

obvious fracture, although there was a small spur on the underside of the calcaneus. Dr. George prescribed Vioxx and padded, supportive shoes. He gave Almanza a work release for three days, but stated she should be able to return to work on October 4, 2001. (R. 159-60)

On October 17, 2001, Almanza's employer called Dr. George to ask about Almanza's foot pain. The doctor stated Almanza's "foot was not actually the problem that was involved with the workman's compensation claim, but more toward the ankle." (*Id.*) He indicated that based on the negative x-ray, he expected Almanza's ankle should be improving. (*Id.*)

Almanza saw Dr. George on November 6, 2001, complaining of pain in both feet following an incident on November 3, 2001, in which a buffing machine ran over her foot. She stated she had twisted her left knee in the incident, and she also was having pain in her low back, neck, and shoulder, all of which she stated occurred when she tried to get out of the way of the buffing machine. The doctor observed muscle tension from the base of Almanza's cervical spine down into her mid-back, and also outward along her shoulders. He also noted Almanza had some tenderness in her sacroiliac junctions with decreased rotation, slight swelling in her feet, and slight swelling and tenderness in the lateral aspects of her left knee. X-rays showed no fracture or dislocation in her feet. The doctor diagnosed Almanza with an acute contusion of both feet, back strain, and left knee strain. He suggested she apply ice to various areas and prescribed Vioxx for pain. He told her to stay off work for the rest of the day, but indicated she could return to work by November 8, 2001. According to the doctor's note, Almanza told him she might already have been fired from her job "not as a direct result of this but do [sic] to some other problems." (R. 155-58)

Almanza returned to see Dr. George on January 23, 2002. She complained of "a lot of back pain and headaches for the last few weeks," unrelieved by medications.

(R. 154) The doctor observed muscle tension at the base of Almanza's head, extending into her cervical and thoracic spine. He found a mild hip imbalance, and noted several ribcage dysfunctional areas. He noted Almanza had gained seven pounds since her last visit in November, and her blood pressure was elevated. He refilled her medications and ordered lab tests. (*Id.*) When the test results were received, Dr. George prescribed Lipitor to lower Almanza's cholesterol, and advised her to lose weight. (*Id.*)

Almanza returned for follow-up on March 18, 2002. She complained that Vioxx was upsetting her stomach, and the doctor switched her to Celebrex. Almanza complained of pain in several joints. She was advised to lose more weight. (R. 153)

Dr. George saw Almanza again on March 28, 2002. She stated she had been feeling depressed, and a friend had observed that Almanza appeared to be under increasing stress. She stated she had taken Zoloft in the past but it caused unwanted side effects. Dr. George continued her on Buspar, and started her on Paxil. He noted Almanza's friend had accompanied her to the appointment and provided good support. (R. 152)

On April 11, 2002, Almanza reported to Dr. George that the Paxil was helping. She was feeling better and had not experienced any major side effects. Her blood sugars were still running somewhat high, and she inquired about switching medications. Dr. George continued her on the Paxil, and added Glucophage to her medications. (R. 151) At her next follow-up on April 29, 2002, Almanza stated she had been dizzy from the Lipitor but she was feeling better. Her blood sugars were improved with the addition of Glucophage. Her weight was up to 298 1/2 pounds. Dr. George continued her on Glucophage and Glucotrol. He switched her from Lipitor to Zocor. (R. 150-51)

Almanza returned for follow-up on May 21, 2002. She reported doing quite well, but had a new complaint of left knee pain. She reportedly felt a "pop" on May 19, 2002, and thought her knee was "dislocated." Her weight was 301, which the doctor noted was a significant gain over the previous few months. He noted Almanza had quit smoking and

had cut out a lot of caffeine. Almanza's knee joint was stable, with only some slight tenderness on the underside. The doctor directed her to use heat on her knee, an Ace wrap as needed, and monitor her weight. Almanza also requested a referral to Fort Dodge Mental Health, stating she was still having problems with depression despite taking the Paxil. Dr. George made the referral. He also increased Almanza's Paxil dosage. (R. 149-50)

Almanza was seen for evaluation of depression and anxiety at North Central Iowa Mental Health Center on May 29, 2002. (R. 144-48) The intake evaluator, social worker Kyle McCard, diagnosed Almanza with Major Depressive Disorder, single episode; Generalized Anxiety Disorder; and Family Relational Problems; and assessed her current GAF at 40, indicating some impairment in reality testing or communication, or major impairment in several areas such as work, family relations, and judgment. *See* DSM-IV at 32. He noted Almanza had a prescription for Zocor but was not taking it. He set a short-term goal of reducing the symptoms from Almanza's depression and anxiety to a manageable level, and scheduled her for individual counseling services. (R. 147-48)

On June 6, 2002, Almanza saw Mr. McCard for follow-up. She reported her medications were helping her somewhat and she was having fewer fatalistic-type thoughts, but her motivation to do things had not improved. Mr. McCard recommended Almanza force herself to participate in activities such as her church choir, going to the library, and other activities. He noted, "Hopefully, in time she will be able to work again where she will have some income and be able to get a car." (R. 142) He observed that Almanza seemed to be more positive and willing to look at her own issues. (*Id.*)

Mr. McCard saw Almanza for individual counseling on June 12, 2002. He noted she had made minimal to moderate progress. Almanza was trying to stay busy and was doing some volunteer work at her church. She felt restricted in what she could do because

she was not working, and had no car or money. She had applied for Social Security benefits. Her GAF assessment remained 40. (R. 141)

On June 25, 2002, Almanza saw psychiatric nurse practitioner Joan Kitten for a psychiatric evaluation. Almanza reported that she took Paxil, Buspar, Glucotrol, and Glucophage. She was supposed to be taking Zocor, but was not taking it. She also occasionally took Celebrex for foot pain. Ms. Kitten noted Almanza's affect was constricted and her mood was rather depressed. She opined Almanza was under-medicated with the Paxil, and she discussed this at length with Almanza. She directed Almanza to take Paxil CR 12.5 mg/day, with a plan to increase the dosage to 25 mg/day in two weeks. She assessed Almanza's current GAF at 50, and her highest GAF in the past year at 60. She recommended Almanza continue seeing Mr. McCard for individual therapy. (R. 138-40) Almanza saw Mr. McCard the same day, and stated she felt she was making some progress. She was more interested in doing things, and reportedly was doing some volunteer work at her church and helping her neighbor plant a garden. Mr. McCard assessed Almanza's current GAF at 45.

Almanza saw Nurse Kitten for medication follow-up on July 9, 2002. Almanza stated she did not notice any difference in her anxiety and depression since raising her Paxil dosage from 10 mg/day to 12.5 mg/day. Almanza expressed reluctance to increase the dosage further, stating that when she was on Paxil 20 mg/day, it made her sleepy. Almanza agreed to try increasing her dosage to 12.5 mg twice daily every other day. (R. 136)

Almanza saw Dr. George for follow-up on July 23, 2002. She stated she had experienced some side effects from the increased Paxil dosage, and she had reduced her dosage. She stated she was doing so much better that she might be able to stop taking Paxil altogether. She continued to take Buspar for anxiety. She requested a thyroid evaluation, noting she took thyroid medication in the mid-1980s, but stopped taking it

because she could not afford the medication. Notes indicate Almanza weighed 308 1/2 pounds, and her blood sugars still were not well controlled. Dr. George ordered lab tests and continued Almanza's medications without change. He noted Almanza would not see overall improvement in her health unless she lost some weight. (R. 135, 149)

Dr. George wrote a letter to Disability Determination Services on July 23, 2002, in response to a request for information about Almanza's condition for the period from November 2000 to July 2002. The doctor noted Almanza was being treated for depression with medications and counseling, and she was doing fairly well overall even on lowered doses of her medications. He found no evidence that Almanza's hips were "dislocated," opining a chiropractor probably was telling Almanza she had a mild "hip imbalance," which Almanza was misinterpreting. Dr. George noted Almanza was obese and did not control her weight, which complicated her diabetes. (R. 133) Regarding Almanza's foot injury in November 2001, Dr. George indicated Almanza "seemed to have no significant problems other than complaints." (*Id.*) He noted Almanza had taken some arthritis medications off and on since the injury. She complained of problems with her left knee, stating she had "dislocated" her knee when she felt a pop on May 19, 2002; however, the doctor had seen no evidence of dislocation. He suggested she might have "some patellar instability due to lack of muscle strength." (R. 134) Dr. George suggested Almanza's problems largely centered around her obesity, which caused strength problems and exacerbated her depression and anxiety. (*Id.*)

Almanza saw Nurse Kitten for medication follow-up on August 14, 2002. Almanza had not increased her Paxil dosage to 25 mg/day as agreed; she was taking 10 mg twice daily. Almanza stated the 25 mg/day dosage made her very sleepy. She stated her depression was ten to twenty percent better and her anxiety was a bit better. Nurse Kitten noted Almanza's mood remained slightly depressed and her affect was constricted.

Almanza stated she was going to visit her daughter at Offutt Air Force Base for the month of November. Almanza also stated she was seeking part-time employment. (R. 163)

On September 17, 2002, Almanza saw Jugal T. Raval, M.D. for a disability evaluation. From his examination of Almanza, Dr. Raval opined she could lift up to sixty pounds occasionally, but she could not carry forty pounds for any distance due to her obesity and hip pain. He opined Almanza would be able to stand, move about, walk, and sit as required during an eight-hour work day if she lost weight and had frequent breaks. He doubted she would be able to stoop, climb, kneel, or crawl. He found no limitations in Almanza's ability to handle small objects, and he indicated she has no environmental limitations. (R. 165; *see* R. 164-67)

On September 19, 2002, John F. Tedesco, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique form concerning Almanza. (R. 168-85) Dr. Tedesco opined that due to Almanza's depression and anxiety, she would have moderate difficulty maintaining concentration, persistence, or pace; mild restriction of the activities of daily living; and mild difficulties maintaining social functioning. He opined she would be moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to changes in the work setting. Otherwise, he found she would not have any work-related limitations due to any mental impairment. (*Id.*) Dr. Tedesco found the record indicated Almanza was showing a good response to treatment, noting she had wanted to stop taking her anti-depressant medication altogether at one point. (R. 171) On August 2, 2003, Lon Olsen, Ph.D. reviewed Dr. Tedesco's findings and concurred in his opinions. (R. 172)

On October 17, 2002, Almanza saw Nurse Kitten for medication follow-up. Almanza had cut her Paxil dosage back to 12.5 mg once daily, stating it made her too tired to take the medication twice daily. She continued to take Buspar. Almanza stated she was

doing very well overall. She planned to spend three months with her daughter in Nebraska, to help care for her grandson. (R. 186)

On December 18, 2002, Almanza's right hip and lumbar spine were x-rayed to evaluate her complaints of pain extending down her right lower extremity. The radiologist's impression from the films was "[d]iffuse degenerative changes, particularly involving the facet joints. This can cause narrowing of the neural foramen. In addition, there are posterior osteophytes which narrow the spinal canal." (R. 131) The radiologist recommended an MRI if Almanza's clinical symptoms persisted. (*Id.*)

On January 8, 2003, Lawrence F. Staples, M.D. reviewed the record and completed a Residual Functional Capacity Assessment form. (R. 187-94) He opined Almanza should be able to lift up to twenty pounds occasionally and ten pounds frequently; sit, stand, and/or walk for about six hours each in an eight-hour workday, and push/pull without limitation. He opined Almanza would be able to perform all postural activities occasionally, except she could balance frequently. He did not find her to have any other work-related limitations. Dr. Staples noted he had reviewed the report from Dr. Raval's evaluation of Almanza, and had given the report considerable weight. (*Id.*) In his notes, Dr. Staples noted Almanza had failed to return a questionnaire about her activities of daily living. (R. 195) On August 5, 2003, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Staples's conclusions. (R. 194)

Almanza saw Dr. George on January 29, 2003, for follow-up of her diabetes and other medical problems. She had lost eleven pounds since October 2002, and weighed 295 pounds, but she still complained of discomfort in her right foot. Almanza stated she had spent some time visiting her daughter in Omaha, where "she was quite active with a grandson which kept her busy most of the time and not eating as much." (R. 197) Her blood sugars were under somewhat better control, with occasional spikes when she did not eat right. Almanza stated she had quit taking Zocor. Dr. George's notes indicate Almanza

could not provide a reason for this, particularly when the drug was being furnished by the drug company. Dr. George noted Almanza had a heel spur, but her foot pain was not in the heel area. He opined she had "an arthralgia and needs to just loosen this up." (R. 198) He refilled Almanza's medications and ordered lab tests. (*Id.*) A follow-up note dated January 30, 2003, states the lab tests indicated Almanza's lipids and glucose levels were elevated. Dr. George started Almanza back on lipid-lowering medications, and directed her to continue monitoring her diet and to keep her weight down. (*Id.*)

On February 10, 2003, Almanza saw Brian L. Hamm, D.P.M. with complaints of pain around the fourth and fifth toes of her right foot. She had been using an Ace bandage and taking Celebrex and Vioxx without relief. Dr. Brian diagnosed Almanza with capsulitis and metatarsalgia of the fourth and fifth metatarsal heads, right foot. He advised her to use premolded orthotics to decrease weight bearing in the area, and he prescribed Mobic. He stated if Almanza did not obtain relief in two to three weeks, she should return for follow-up, a possible injection into the joint, and possibly consideration of custom-made orthotics. (R. 196)

Almanza returned to see Nurse Kitten for medication follow-up on March 31, 2003. Almanza stated she had spent the winter with her daughter in Nebraska, where Almanza cared for her grandchildren. She reportedly had taken her Paxil regularly, and she had cut back on her Buspar dosage, indicating "her life was not nearly as stressful" at her daughter's home. (R. 201) She was looking for work but was having difficulties due to lack of transportation. Overall, Almanza stated things were going pretty well for her. Her Paxil dosage was continued without change, and she completed paperwork to obtain public assistance to pay for her Buspar. (*Id.*)

Nurse Kitten saw Almanza for follow-up on October 21, 2003. She reported doing fairly well, although she was somewhat depressed due to the impending anniversary of her

mother's death.  She agreed to increase her Paxil dosage to 25 mg/day for the next month.

Almanza requested a sleep aid, which Nurse Kitten agreed to get for her.  (R. 200)

Almanza returned to see Nurse Kitten on December 15, 2003.  Almanza stated she had done quite well "since being home [from] the hospital."[2]  (R. 199)  Almanza planned to investigate hormone replacement therapy to help her with hot flashes.  Nurse Kitten referred her to a gynecologist.  (*Id.*)

Almanza saw Nurse Kitten for follow-up on April 26, 2004.  She had run out of her medications for five or six days about three weeks earlier, and she noted that without her medications, she felt irritable, sad, and tearful.  After she resumed her medications, she was back to her baseline.  She again complained that 25 mg/day of Paxil made her feel sleepy, and she expressed a desire to return to the 12.5 mg/day dosage.  She stated she had been active in her church and was doing volunteer work.  She also had been crocheting blankets for needy people in her church.  Nurse Kitten reduced Almanza's Paxil dosage. (R. 219)

Nurse Kitten saw Almanza for follow-up on June 7, 2004.  Almanza stated she was doing very well.  She was volunteering at her church, and planned to begin volunteering at a free clinic.  Her mood was good and she was resuming counseling with therapist Rhonda Wykoff.  (R. 218)

On June 14, 2004, Almanza saw Ms. Wykoff for an evaluation and development of a treatment plan.  Ms. Wykoff noted Almanza had only seen therapist Kyle McCard briefly, and Almanza had made only minimal progress toward her goals as identified in her May 2002 evaluation.  Ms. Wykoff recommended a treatment plan consisting of ten

---

[2]Almanza also mentioned this hospitalization during her hearing testimony.  (*See* R. 258-59)  The undersigned has not located entries in the record concerning the hospitalization referred to in this progress note.  Almanza's attorney similarly could find no evidence of this hospitalization in the record.  (*See* Doc. No. 12, p. 7)

sessions between June 14 and December 30, 2004. She assessed Almanza with Major Depressive Disorder, single; Generalized Anxiety Disorder; and Family Relational Problems. She assessed Almanza's GAF at 45. (R. 215-17) Almanza completed a treatment checklist and identified specific goals that included increasing her self-worth and exploring family-related issues. She discussed an incident of sexual abuse when she was a young child, and its impact on her relationships since that time. Ms. Wykoff noted Almanza's mood was slightly depressed. (R. 213-14)

Almanza saw Ms. Wykoff again on June 28 and July 20, 2004, for continued counseling. The therapist noted improvement in Almanza's mood and affect, and she provided Almanza with literature and medication samples. (R. 209-12) At Almanza's next session, on August 3, 2004, she stated she was feeling better after each counseling session, and others around her also were noticing a change in her demeanor. Almanza was losing weight and her feelings of self-loathing were diminishing. Ms. Wykoff assessed Almanza's GAF at 50. (R. 207-08)

Almanza went to Nebraska for about a month to visit her daughter, and she next saw Ms. Wykoff on October 5, 2004. Almanza commented that she had enjoyed her birthday celebration, which was an improvement over past birthdays, and she was looking at life differently. She planned to apply for a part-time cleaning job at her church. Ms. Wykoff assessed Almanza's GAF at 50 to 55. (R. 205-06)

On February 2, 2005, Nurse Kitten completed a form regarding her opinion of Almanza's work-related mental abilities. She noted Almanza's current diagnoses were Major Depressive Disorder, Recurrent, Moderate and Generalized Anxiety Disorder, with a fair prognosis. She cited Almanza's symptoms of depression as "lack of motivation, difficulty sleeping, some anhedonia, fearfulness and anxiety." (R. 220) Nurse Kitten opined Almanza would have poor or no abilities to maintain regular attendance and be punctual within usual tolerances; sustain an ordinary routine without special supervision;

work in coordination with or proximity to others without being distracted unduly; and complete a normal workday and work week without interruptions from psychologically-based symptoms. She opined Almanza would have a good ability to be aware of normal hazards and take appropriate precautions, but she opined Almanza would have only a fair ability to understand, remember, and carry out even short and simple instructions, maintain attention for two-hour segments, perform at a consistent pace, and deal with coworkers, supervisors, and the public. (R. 221-22)

### 3.    *Vocational expert's testimony*

The ALJ asked VE Brian Paprocki to consider an individual fifty-one years old, forty-eight years old at the alleged onset date, with a high school education, sixty credit hours of college course work, Almanza's past relevant work, and the following limitations:

> [L]ifting to ten pounds frequently and 20 occasionally, stand and sit for six hours each in an eight hour work day, never climb ladders, occasionally climb stairs and occasionally stoop, kneel, crouch and crawl, and frequently only balance. And the mental limitations we limit to, I'm going to limit to simple routine, repetitive tasks, only occasional changes in a routine work setting, frequently only understand, remember and carry out detailed instructions.

(R. 265) The VE stated the hypothetical individual would be able to return to Almanza's past relevant work as an office helper, which is light, unskilled work activity. (R. 265; *see* R. 263-64) If the hypothetical individual could perform semi-skilled work, rather than only unskilled work, then the individual could return to all of Almanza's past work, including telephone solicitor, cashier/checker, customer service representative, and food service clerk. (R. 266)

The ALJ next asked the VE to consider the same hypothetical individual, but with the following additional limitations: limited to unskilled work; standing limited to thirty minutes at a time, up to two hours in an eight-hour work day; sitting limited to thirty

minutes at a time, up to six hours in an eight-hour work day; only occasional exposure to extremes of heat, cold, and humidity; and only occasional interaction with the public and coworkers. (R. 266) The VE stated this hypothetical individual would be limited to sedentary, unskilled work, and therefore would not be able to return to any of Almanza's past work. However, the individual would be able to do administrative support activities such as document preparer, addresser, and mass mailing preparer, and assembly activities such as eye dropper assembler and lamp assembler. The VE stated these jobs "are sedentary, would involve sitting as the primary function of the job, but allow good latitude for positional change to standing as well." (R. 267) The VE stated his opinion would not change if the individual could only lift five pounds frequently and ten pounds occasionally. (*Id.*)

The ALJ then asked the VE to consider the same individual, but to add the restriction that the individual would have to take unscheduled rest breaks twice daily for thirty minutes at a time. The VE stated such an individual would be unable to work. He noted "the amount of time lost during the day would not be able to be made up by the individual as far as productivity in order to meet the minimum requirements of the work." (R. 268) Also, in terms of mental functioning, if the individual in the second hypothetical would have to be reminded several times per hour to stay on task, then the individual would be unable to maintain employment. (R. 270)

### 4.    *The ALJ's decision*

The ALJ found Almanza had not engaged in substantial gainful activity since her alleged disability onset date of November 3, 2001. He noted that Almanza had done some babysitting periodically, but not at the substantial gainful activity level. (R. 14)

The ALJ found Almanza has severe impairments consisting of depression and obesity, and non-severe impairments consisting of diabetes and complaints of hip pain.

He found that due to her mental impairments, Almanza would have a mild limitation in the activities of daily living and maintaining social functioning, and a mild to moderate limitation in the ability to maintain concentration, persistence, and pace. He concluded she is not disabled due to her mental impairments. (*Id.*)

In reviewing Almanza's medical records, the ALJ specifically discounted the opinions and conclusions of Nurse Kitten because the ALJ found her opinions to be inconsistent with Nurse Kitten's own treatment notes. (R. 18)

According to the ALJ, Almanza's activities of daily living are inconsistent with her allegation that she is disabled. He noted Almanza cares for herself, does laundry and takes out the trash regularly, and occasionally changes sheets, irons, vacuums or sweeps, and does home repairs. She prepares meals regularly, goes to the grocery store twice per month, and walks to the library twice per week. She also sews, plays cards, uses the computer, and reads. She attends church and sings in the choir during good weather. The ALJ noted Almanza had expressed interest in cooking and had described ideas for arts and crafts projects for the children at her church. She also reported being quite active with her grandson and she volunteered at a free clinic. The ALJ found all of these activities to be inconsistent with an allegation of total disability. (R. 20-21)

The ALJ further noted Almanza was somewhat noncompliant with her treatment and medications. She has not always checked her blood sugar levels regularly. She quit taking her cholesterol medication without consulting her doctor. She failed to control her obesity, which complicates her diabetes. And she altered her Paxil dosage more than once without checking with her doctor. The ALJ found this evidence of Almanza's noncompliance weighed against the credibility of Almanza's subjective complaints. (R. 21)

The ALJ also noted inconsistencies in the record that he felt detracted from Almanza's credibility.[3]  Almanza frequently complained of hip pain to some of her doctors, but she did not complain of hip pain to her family doctor, nor did she seek pain medications, and X-rays showed no abnormality in her right hip.  Examinations showed Almanza has good strength in all of her extremities, symmetrical reflexes, and a normal gait, except that she cannot walk on her tiptoes or heels.  In addition, Almanza stated she only uses over-the-counter medications for pain, but the evidence indicates she does not even take over-the-counter pain medications regularly.  The ALJ also noted Almanza told one doctor she had attempted suicide in March 2002, but the record contains no other evidence of a suicide attempt.  (*Id.*)

The ALJ noted the record indicates Almanza has received good benefit from her medications for symptoms of depression, and her periods of marked improvement indicate she has not been disabled from depression for any period of at least twelve months. (R. 22)

Based on inconsistencies in the record, Almanza's failure to comply with treatment and medication recommendations, her daily activities, and her improvement over time with medications, the ALJ concluded Almanza's subjective complaints were less than fully credible to the extent those allegations were inconsistent with the ALJ's finding that Almanza is not disabled.  (R. 22)

Based on the evaluations from the State agency consultants, and giving weight to the VE's testimony, the ALJ concluded Almanza is able to return to her past relevant work.  As a result, the ALJ concluded Almanza is not disabled.  (R. 23-24)

---

[3]The ALJ finds inconsistent two treatment notes regarding the length of time Almanza cared for her mother.  (*See* R. 21, referencing R. 144 & 213-14)  The court does not find these two record entries necessarily to be inconsistent and gives them no weight in evaluating the ALJ's credibility determination.

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Almanza argues the ALJ erred in his evaluation of Nurse Kitten's opinions, and the ALJ failed to give proper consideration to the effects of Almanza's obesity on her back and hip pain and other complaints. (*See* Doc. No. 12)

On the first point, Almanza notes the ALJ relied on treatment notes that indicated Almanza was "doing well" in her therapy. Almanza argues those notes are not reflective of her work-related functional abilities, citing *Hutsell v. Massanari*, 259 F.3d 707, 712

(8th Cir. 2001). (Doc. No.1 2, p. 13) In *Hutsell*, the Eighth Circuit Court of Appeals noted, "Given the unpredictable course of mental illness, '[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse.'" *Hutsell*, 259 F.3d at 711 (quoting *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996)). The court further recognized that individuals with mental disorders "commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms," and such individuals "may be much more impaired for work than their signs and symptoms would indicate." *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) (1999)).

Although the *Hutsell* court was considering an individual with a marked psychotic disorder that was more serious than the mental impairments evidenced by Almanza, the reasoning nevertheless is applicable in the present case. It is significant that Almanza's periods of "doing well" often were following by periods of time she spent visiting her daughter in Nebraska, where she would have had assistance with most aspects of daily life and where, as Almanza reported to her therapist, her stress level was greatly reduced. As the *Hutsell* court observed, "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." *Id.*, 259 F.3d at 712 (citing *Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992); *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir. 1991)). The court finds Nurse Kitten's opinions regarding Almanza's mental functioning do not conflict with her treatment notes or the treatment notes of Almanza's therapists, which Nurse Kitten had available to her when she prepared her written opinion.

In the Commissioner's brief, she argues the ALJ need not rely on the opinions offered by Nurse Kitten because the nurse is an "other" medical source. (Doc. No. 13, p. 9) The Commissioner's brief predated her ruling of August 9, 2006, brought to the court's attention by Almanza (*see* Doc. No. 15), in which the Commissioner made it clear

that depending on the particular facts of a case, the opinion of a medical source who is not an "accepted medical source" for purposes of the regulations may outweigh the opinions of "acceptable medical sources," including treating sources, and giving great weight to those "other" medical sources does not conflict with the treating source rules in the regulations. SSR 06-03P, 2006 WL 2329939 at *5 (Aug. 9, 2006).

The court finds the ALJ erred in failing to give great weight to the opinions of Nurse Kitten regarding Almanza's work-related mental functional abilities. The court further notes the ALJ's findings were, themselves, inconsistent, in that he found Almanza would be limited to "simple, routine, repetitive" work, yet she could "frequently remember, understand, and carry out detailed instructions." (R. 24)

Turning to Almanza's second argument, she claims the ALJ failed to give adequate consideration to the effects of Almanza's obesity on her back pain and other complaints. Again, the court agrees. The ALJ found Almanza's obesity to be a severe impairment, but he failed to consider the cumulative effects of Almanza's obesity on her musculoskeletal system and complaints. The regulations recognize that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effect of each of the impairments considered separately." 20 C.F.R. Pt.404, Subpt. P, App. 1, § 1.00Q.

The record is replete with references to Almanza's obesity and fluctuating weight, and with her doctors' recommendations that she lose weight. The court notes the disability examiner, Dr. Raval, based his recommendation regarding Almanza's work-related physical functional capacity on what her condition would be *if* she lost weight. Such a speculative opinion is useless in evaluating a claimant's current physical functional capacity.

The ALJ posed hypothetical questions to the VE that were based on the ALJ's assessment of Almanza's residual functional capacity without taking into account the effects of her obesity on her musculoskeletal complaints. If a hypothetical question does

not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence to support the ALJ's finding of no disability. *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)). The court finds the ALJ's hypothetical questions to the VE failed to describe accurately Almanza's abilities and impairments as evidenced by the record, and therefore, the VE's testimony cannot constitute substantial evidence to support the ALJ's conclusions.

For all of these reasons, the undersigned finds the ALJ erred in finding Almanza can return to her past relevant work. This matter should be remanded for further proceedings, directing the Commissioner to give proper weight to Nurse Kitten's opinions, to consider the effects of Almanza's obesity on her musculoskeletal complaints, and to proceed through step five of the sequential evaluation process, further developing the record as necessary.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 11th day of September, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT